**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DUNLEAVY CONSTRUCTION COMPANY, an Illinois corporation<br><br>  Plaintiff,<br><br>    v.<br><br>NATIONWIDE MUTUAL INSURANCE COMPANY, an Ohio corporation,<br><br>  Defendants. | Case No. 21-2545 |

## COMPLAINT

  Plaintiff, Dunleavy Construction Company ("Dunleavy"), by its attorneys Patrick G. Donnelly and Thomas A. McGettrick, complains against Defendant Nationwide Mutual Insurance Company ("Nationwide") for breach of contract.

## Parties

1. Plaintiff, Dunleavy Construction Company ("Dunleavy"), is an Illinois corporation with its principal place of business at 4605 N. Elston Avenue, Chicago, Illinois. It is an underground contractor.

2. Nationwide Mutual Insurance Company ("Nationwide") is an Ohio corporation with its principal place of business in Columbus, Ohio. It sells construction surety bonds in Illinois for profit.

## Jurisdiction

3. This court has jurisdiction over this suit based on diversity of citizenship, under 28 USC §§ 1332, 1441, and 1446.

4. Dunleavy sues for $595,242.49.

5. There is complete diversity between the two parties.

## **Facts**

6.      Dunleavy performed construction work on a project to replace water mains and reconstruct a parking lot at Edward Hines Jr. VA Hospital 5000 S. Fifth Ave., Hines, IL 60141 ("Project").

7.      The United States of America was the owner of the Project.

8.      The U.S. Army Corps of Engineers ("USACE") managed the Project and acted as the contracting officer on behalf of the United States.

9.      Richard Group, LLC ("Richard Group") was the general or the prime contractor for the Project.

10.     Chicago Area Plumbing Inc. ("CAP") was a subcontractor to Richard Group.

11.     Dunleavy was a subcontractor to CAP.

12.     Nationwide issued payment bond number 761454 to CAP for the "VA Hines Watermain Contract #W912QR-19-C-0015" in the amount of $2,617,000.00 (the "Bond"). The Bond issued for the benefit of Richard Group, as obligee, and Dunleavy as Claimant, per the terms of the Bond. The Bond is attached as Exhibit 1.

13.     Under the Bond, §§ 1 & 2, Nationwide agreed to be liable to pay for labor and equipment furnished for use in the performance of the CAP-Dunleavy subcontract.

14.      Dunleavy furnished labor and equipment for use in the Project pursuant to its subcontract with CAP.

15.     Dunleavy's work included extra labor and equipment beyond the scope of its subcontract at CAP's direction. For example, on Dunleavy's first day on the Project, CAP instructed Dunleavy to excavate an area of the site that was not in Dunleavy's subcontract scope of work. Dunleavy's Tom McGinnis, and Aaron Henson notified CAP that the work was outside the contract area, CAP agreed that the work was out-of-scope

but directed that it be done. Other extras due to inaccurate plans and specifications (which did not accurately reflect the existing underground conditions) were approved by the owner USA to Richards, and, substantially, by Richards Group to CAP.

16. Dunleavy performed the out-of-scope work as directed and submitted work tickets to CAP's superintendent showing the work. Dunleavy was instructed to refrain from submitting invoices for any out- of-scope work which would be "worked out" by CAP with pending credits CAP would be issuing due to changes in the work. It ended up, these credits were never forthcoming; the changes to the contract were additive to Dunleavy's work, not reductive.

17. Dunleavy did all the actual labor and equipment work—the digging and the installing of pipe—while CAP purchased the material for the underground work. As shown in the certified payrolls CAP submitted, on most days, CAP had one worker on the site part-time. Dunleavy frequently had teams of workers—actually doing the digging and pipe installation work.

18. Dunleavy also submitted change orders weekly and billed changed orders as directed by CAP, monthly. The unit costs were agreed. CAP paid certain extra work items and deferred others, allocating its payments to pending invoices, telling Dunleavy which invoices its checks were in payment of—and paid invoices were marked "paid."

19. As the job progressed, Dunleavy persistently asked CAP about getting paid on its out of scope and extra work. CAP staved off Dunleavy's requests for payment on the "extra" work, by falsely telling Dunleavy that CAP had not been paid for the work, that the work was not approved yet, and, in the final days of 2020, that CAP had to figure out what sums were owed, since, CAP claimed it was owed a credit. CAP directed Dunleavy to keep working.

20. CAP specifically directed Dunleavy *not* to list the extra work on its payment applications. CAP instructed Dunleavy each month exactly what work to bill and show in its pay requests. CAP told Dunleavy the out-of- scope work was *pending* as extra work under the prime contract. Dunleavy could apply for payment, but only after the work had been proposed and approved by the owner, the United States. CAP told Dunleavy it would pay for out of scope and extra work when the work was approved and paid.

21. CAP's explanation to Dunleavy that change order work could not be included in the payment applications process comports with the local custom and practice on public projects: extra claims known to subcontractor and general contractor and the owner are not billed or identified in the pay application documents, they are carried on the books of each, then billed when approved by the owner. That is, everyone up and down the chain of privity knows that there are extra work claims, but the claims process omits mention of unapproved extras.

22. In this case, however, CAP's statements to Dunleavy regarding the scope of its contract and the status of payments to CAP for the so-called out-of-scope work were false. Documents Dunleavy obtained through FOIA requests show that, unbeknownst to Dunleavy, the scope of the prime contract had been expanded at the start of the Project. See for example the options and additions in Richard Group's payment estimate number 21 dated January 5, 2021, attached hereto as Ex. 2:

| 5. ITEM NO. | MOD. NO. | a. DESCRIPTION CONTRACT LINE ITEMS | b. CONTRACT (1) QUANTITY AND UNIT | b. CONTRACT (2) UNIT PRICE | b. CONTRACT (3) AMOUNT | c. TOTAL TO DATE (1) QUANTITY AND UNIT | c. TOTAL TO DATE (2) AMOUNT |
|---|---|---|---|---|---|---|---|
| 0001 | | Base - VA Hines Water Mains Ph. 3B | 1 JA | $3,566,576.00 | $3,566,576.00 | | |
| | A00001 | Lump Sum Unit Price Increase | 1 JA | $366,437.71 | $366,437.71 | | |
| | | Revised Amount CLIN 0001 | 1 JA | $3,933,013.71 | $3,933,013.71 | 99.9% | $3,932,413.71 |
| 0002 | | Option 1 - Water Main south Kansas Lot | 1 JA | $688,897.00 | $688,897.00 | 100.0% | $688,897.00 |
| 0003 | | Option 2 - Water Mains Housing Quarters | 1 JA | $0.00 | $0.00 | 0.0% | $0.00 |
| 0004 | | Option 3 - Add'l Drain Tile Ext | 1 JA | $11,280.00 | $11,280.00 | 100.0% | $11,280.00 |
| 0005 | | Option 4 - Add'l Water Line Field Mods | 1 JA | $50,770.00 | $50,770.00 | | |
| | P00002 | Lump Sum Unit Price Increase | 1 JA | $101,540.00 | $101,540.00 | | |
| | P00005 | Lump Sum Unit Price Increase | 1 JA | $101,540.00 | $101,540.00 | | |
| | | Revised Amount CLIN 0005 | 1 JA | $253,850.00 | $253,850.00 | 100.0% | $253,850.00 |
| 0006 | A00002 | REA #1 - Utility Conflicts | 1 JA | $262,053.15 | $262,053.15 | 100.0% | $262,053.15 |
| 0007 | P00006 | P00006 - REAs 2 & 3 | 1 JA | $144,846.60 | $144,846.60 | 100.0% | $144,846.60 |
| 0008 | P00007 | P00007 - REA #4 - Additional Conflicts | 1 JA | $800,938.22 | $800,938.22 | 100.0% | $800,938.22 |
| 0009 | P00008 | P00008 - Conflicts at Link | 1 JA | $72,679.46 | $72,679.46 | 100.0% | $72,679.46 |
| | | TOTALS - CLIN DETAILS - ALL PAGES | | | $6,167,558.14 | | $6,166,958.14 |

(Ex. 2, page 2.)

23. The options and additions the USA picked up included the work done by Dunleavy at the Project that CAP claimed was "unapproved" extra work. CAP's subcontract with Richard Group was expanded early in the project as well. So, much of the "extra" work performed by Dunleavy early in the project, in fact, was not extra to the general or prime contract, it was work that was included by the USA as owner electing to expand the scope of the Prime Contract as reflected in Exhibit 2 and printed above.

24. Exhibit 2 shows that the USA paid substantial sums for Dunleavy's work to the prime contractor, Richard Group, which, in turn paid CAP, but CAP has failed and refused to pay Dunleavy. Among other things, pay estimate 21 (Exhibit 2) shows that the original contract was increased from $3,566,576.00, to $6,167,558.14. (See page 2 of Ex. 2.)

25. The Prompt Payment Certifications Richard Group submitted with its pay estimates reflects that while CAP's initial subcontract was for $2,617,000, it was paid $3,921,365 in total. (Compare Prompt Payment Certificates 14 and 21, attached as Ex. 3, page 1 with page 7, boxes 11 and 12, showing that CAP was paid $3,834,230.00 plus $87,135.00.) That is, CAP received extra compensation/increased scope of $1,304, 365.

5

Dunleavy, however, did the extra work and was not paid.

26. CAP directed Dunleavy to perform extra work and out of scope work, and Dunleavy did the work and billed CAP. Until the work was completed, CAP never rejected or disputed the invoices; it accepted the invoices and demanded more extra work. CAP knew but did not tell Dunleavy that, from the start of the project, the USA as owner had elected to expand the scope of the Prime Contract and Dunleavy could have billed the so-called "extra" work under the contract all along. CAP then pocketed the extra payments from Richard Group rather than pay them to Dunleavy.

27. The federal payment process requires certifications that, with each application—all prior approved work had been paid for, subs and suppliers—all sums due subcontractors had been paid.

28. The certifications made by Richard Group with the later pay application were false—they state all subcontractors and suppliers had been paid with monies previously paid out. This was not true.

29. Dunleavy billed CAP of $2,291,893.30, received payments from by CAP of $1,696,650.81 (on an original subcontract price of $700,000), leaving and a balance due of $595,242.49. The only credit or back charge CAP raised to Dunleavy—the only substantive defense to Dunleavy's claim raised by CAP is a disputed reductive change order of $69,984, which CAP issued at job end.

30. All this was reflected in the Bond claim Dunleavy submitted to Nationwide on March 5, 2021, and in the back up evidence it supplied to Nationwide on March 29, 2021.

## Count I – Breach of Contract against Nationwide

31. Dunleavy incorporates all of the foregoing paragraphs in this Count I.

32. Under the Bond, §§ 1 & 2, Nationwide agreed to be liable to pay for labor, and equipment furnished for use in the performance of the CAP-Dunleavy subcontract.

33. Dunleavy furnished labor, and equipment for use in the Project pursuant to its subcontract with CAP, including but not limited to all the work that CAP told Dunleavy was out of scope.

34. Dunleavy is a "claimant" with a "claim" under § 16 of the Bond.

35. Nationwide received Dunleavy's claim by certified mail at the address stated on the Bond on March 5, 2021 (Exhibit 4, the signed certified mail receipt); Pursuant to § 5 the Bond, Nationwide's obligations to Dunleavy as claimant arose when Nationwide received the claim on March 5, 2021.

36. The Bond required Nationwide to respond to the claim in 60 days:

> § 7.1 Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts thot are disputed; and
>
> § 7. 2 Pay or arrange for payment of any undisputed amounts.
>
> § 7.3 The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement.
>
> If, however, the Surety foils to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

37. On March 11, 2021, Nationwide acknowledged receipt of the claim and demanded all of Dunleavy's documents relating to the project.

38. By email dated March 29, 2021, Dunleavy met Nationwide's informational demands. Dunleavy produced thousands of pages of records, organized by topic to

support the Bond claim. (See email and index of records sent to Nationwide on March 29, 2021 submitted as Exhibit 5.) Dunleavy provided the certified payroll statements for CAP and Dunleavy to Nationwide to support its Bond claim. Dunleavy's weekly invoices to CAP were also sent to Nationwide on March 29, 2021.

39. Dunleavy's original Bond claim was verified, so it declined to reverify its claim as demanded by Nationwide. Nationwide agreed that this was not grounds for rejection of the claim in its correspondence of April 6, 2021. (Exhibit 6.) Nationwide refused Dunleavy's request that it demand the same level of information from CAP, and further, that it hand those records over to Dunleavy. (Exhibit 6.)

40. Dunleavy completed its work for the Project.

41. Dunleavy's last day on the Project was December 16, 2020.

42. Dunleavy performed work on the Project with a value of $2,291,893.30.

43. Dunleavy has received payments for its work from CAP totaling $1,696,650.81.

44. Dunleavy's work including the work it has not been compensated for was known and approved and accepted by the USA and Richard Group and CAP.

45. Dunleavy has performed all conditions precedent to its right to payment.

46. Dunleavy asked CAP and Richard Group for an accounting of contract status and each has refused.

47. Dunleavy also asked Nationwide to obtain this information from CAP and provide it to Dunleavy—it refused.

48. Despite due demand and notice, CAP has refused to pay the balance due.

49. Despite due demand and notice, Nationwide has refused to pay Dunleavy sums due and owing to it.

50. After applying all valid credits due, Nationwide owes Dunleavy $595,242.49 for

labor, and equipment furnished for and incorporated into the Project.

51. Nationwide breached § 7.2 by failing to pay Dunleavy the undisputed sums due it: the sums for Dunleavy's work, for which CAP has been paid. There are certified payrolls on this project detailing every bit of labor provided by Dunleavy (and, conversely, not spent by CAP). Also, Dunleavy submitted to Nationwide work tickets and weekly time and material bills at agreed upon unit costs, and Nationwide has not addressed these, or, utilized them to determine which sums are not subject to legitimate dispute.

52. Nationwide breached § 7.3 of the Bond, by failing to timely provide a substantive response within 60 days as required by 7.1. A substantial portion of Dunleavy's claim is undisputed—CAP applied for and received payment for Dunleavy's work, so there is no legitimate basis for dispute.

53. By these omissions and failures to act, Nationwide has breached § 7.1, 7.2 and 7.3 of the Bond.

54. Dunleavy has been damaged by Nationwide's breach of the Bond in the amount of $595,242.49, plus its attorneys' fees, triggered by breach of § 7.3.

WHEREFORE, Plaintiff, Dunleavy Construction Company prays for a judgment in its favor and against Defendant Nationwide Mutual Insurance Company, for an award of damages in the sum of $595,242.49, for an award of attorney's fees pursuant to section § 7.3 of the payment Bond, for an award of the costs of this lawsuit, and for such other and further relief that the Court deems just.

Respectfully submitted,

**Dunleavy Construction Company**,

By: /s/ Patrick G. Donnelly
      One of its attorneys

Patrick G. Donnelly (6194471)
Thomas A. Mc Gettrick
Donnelly & Harris, LLC
6430 N Central Ave, Suite 207
Chicago, IL 60646
(312)564-5210
pdonnelly@donnellyharris.com
tmcgettrick@donnellyharris.com